## ANNE ARUNDEL COUNTY, MARYLAND
### *v.* BOWEN, ET AL.

[No. 51 (Adv.), September Term, 1970.]

*Decided July 9, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*John M. Court, Assistant County Solicitor,* with whom was *Phillip F. Scheibe, County Solicitor,* on the brief, for appellant.

*Morris Turk,* with whom were *Turk, Manis & Duckett* on the brief, for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

While we resort to divination only rarely, we think it has helped us perceive what this appeal is all about. As

we see it the question is what must Anne Arundel County's condemnation petition allege in order to survive a demurrer. We shall relate only those circumstances which seem to have significance.

On 26 November 1969 "Anne Arundel County, Maryland" (the County) filed its "Petition for Condemnation." The allegations, somewhat abridged, are as follows:

1. The County is authorized by Section 1-317 of the county code "to acquire by condemnation for public purposes, as such purposes are set forth in any capital improvement expenditure appropriation ordinance" such interests in real property as the County Executive may deem "necessary or advisable."

2. The County Executive has determined "that it is necessary and proper" to acquire for the realignment of the Riva Road the 1.82 acres of appellees' (the Bowens) land which is precisely described and shown on plats filed as exhibits.

3. Attached as an exhibit, and by reference made part of the petition, is a formal communication, dated 17 November 1969, from the Director of the Department of Public Works to the County Executive reciting unsuccessful attempts to purchase the property proposed to be used for improvement to the Riva Road and requesting that the "County Solicitor be directed to proceed to acquire the property described." The communication goes on to state that the "requested acquisition has been duly authorized in County Ordinances No. 31 in 1967, 39 in 1968 and 28 in 1969 and [that] the capital project there authorized is described in detail in project 81-83-239-Riva Road." An appraisal was attached and the zoning was said to be Agricultural. Attached as an additional exhibit is a direction by the County Executive to the County Solicitor to begin condemnation proceedings against the Bowens, in the matter of

"Capital Project for Riva Road North, Phase 1."

4. There is a public necessity for the condemnation.

5. The purpose is "the realignment of a public road."

6. A reasonable and bona fide effort to purchase the property has been unsuccessful.

Resolution 30-69, dated 21 October 1969, of the County Council (the Council), ratifying certain other condemnations (this case was not mentioned), was filed as an exhibit, but for what purpose is unclear. We shall treat it as surplusage.

The Bowens demurred on the ground that the petition "fails to state or show, aside from mentioning Section 1-317, the authority, ordinance or resolution passed by the Council of Anne Arundel County for the necessity of and authority for the taking" of the property. After a hearing the trial judge sustained the demurrer with leave to amend within 15 days. He gave no reason for his action. The County declined to amend. From the judgment for costs, entered 19 March 1970, this appeal was taken.

Section 2 of Article XI-A of the Constitution of Maryland required the General Assembly to provide by a public general law "a grant of express powers" to counties establishing a charter form of government. In obedience to the mandate the General Assembly enacted the Express Powers Act, Code, Art. 25A, § 5 (1966 Repl. Vol.). Subsection (K) grants to charter counties the power "to provide for [the] grading * * * and repairing [of] any * * * road * * * within said county * * * condemned, ceded, opened, widened, extended or straightened as public property * * *." Subsection (B) grants the power "to provide for the acquisition by purchase, lease or otherwise, and condemnation of property required for public purposes in the county." Subsection (A) grants the power "to enact local laws * * *." In the preamble to the charter adopted by the voters of Anne Arundel County on 3 November 1964 there is expressed the desire of the people

to "establish separate legislative and executive branches." Sec. 401 of the charter makes the County Executive "the chief executive and administrative officer of the County and the official head of the County government." Sec. 405 (a) requires him "to supervise, direct and control * * * the executive branch of the County." Sec. 306 vests in the Council the law-making power of the County but Sec. 309 forbids interference with the executive branch. *See* M. P. Moser, *County Home Rule — Sharing the State's Legislative Power With Maryland Counties*, 28 Md. L. Rev. 327 (1968).

In 1965, soon after the new government assumed control, the Council enacted Bill No. 14, now codified as Sec. 1-317 of the Anne Arundel County Code. It provides, in part, as follows:

> "The county is authorized to acquire by purchase, lease or condemnation for public purposes as such purposes are set forth in any capital improvement expenditure appropriation ordinances, the fee simple, leasehold or such other interests *as the county executive may deem to be necessary or desirable* in any real property located within the county, including any or all property rights, interests, easements or franchises in the same. If the county executive is unable to agree with the owner or owners on the purchase price of such property or interest therein, *he shall forthwith notify the solicitor for the county who shall thereupon institute in the name of the county for necessary legal proceedings to acquire by condemnation the property or any interest therein.* No property or interest therein shall be purchased, by condemnation or otherwise, unless funds for the same shall have been included in the capital budget, the award of a condemnation jury notwithstanding." (Emphasis added.)

In May 1969 the Council enacted Bill No. 28-69, referred

to in the exhibit made a part of the condemnation petition, Section 10 of which "further" enacts "that funds for expenditures for the Capital Projects herein specified are hereby appropriated for the County Capital Construction Fund during the fiscal year beginning July 1, 1969 and ending June 30, 1970." Item 31 of Subsection E, Roads and Bridges, indicates an appropriation of $353,-900 for "Riva Road I." The plats filed as exhibits with the petition suggest considerable engineering work by Matz, Childs and Associates, Engineers and Surveyors.

Fully rendered the Bowens' argument seems to come to this: that the Legislature's grant of the power of eminent domain is to the County and that it would be improper for the County to delegate it to the County Executive; therefore, they conclude, the power cannot be exercised without "some action by the Council with respect to this specific piece of property," after which "the Executive Officers [could] carry out the ministerial duties necessary to effectuate the action of the Council." Much the same argument was made, and rejected, in *Hormes v. Baltimore County*, 225 Md. 371 (1961). There the County Executive of Baltimore County leased the second floor of an office building for ten years to house the County Health Department. Hormes contended the County Executive was without power to negotiate and execute the lease until authorized to do so by an enabling act of the County Council. It will be recalled that the voters of Baltimore County adopted their charter in November 1956. The Anne Arundel charter was patterned after the Baltimore County charter and both are similar in many respects. Judge Marbury, for the Court, noted that "it is abundantly clear that a system of government based on the traditional 'separation of powers' was intended." *Id.* at 375. As has been said the voters of Anne Arundel County spelled out the separation in their preamble. Judge Marbury went on to say:

> "It is clear that the County Executive and the County Administrative Officer are the directing heads of the general administration of County

affairs and have the duty, power and obligation to carry on the day to day business of the County.

"Carrying out this principle of 'separation of powers,' Article III of the Charter is entitled 'The Legislative Branch' and § 306 thereunder states that: 'The County Council shall be the elected legislative body of the county and is vested with all the law making power thereof * * *. The County Council may enact public local laws for the county * * *.'

"To make it even more certain that the two branches of the government would operate separate and apart § 310 [309 in the Anne Arundel charter] of the Charter prohibits interference by the Council, or any of its members, with 'any officer, agent or employee in the executive branch of the County government other than the County Executive. * * * nor shall they in any manner attempt to influence or coerce any such officer, agent or employee in the performance of his duties.' Thus the Charter has established a system of county government in which the executive branch and the legislative branch are separate and distinct, with neither having control over the other.

"It, therefore, becomes necessary to decide which branch of government has the power to acquire property for County purposes by purchase or lease. Since the County Executive has the duty to supervise, direct and control the administrative services of the County, he must of necessity acquire appropriate office space and such other facilities as may be necessary from time to time to properly conduct the County's business. * * * It seems obvious, and we so hold, that this is an executive rather than a legislative function.

"By Article I, § 2-1 of the Baltimore County Code (1958 Ed.) the County is 'authorized and

empowered to acquire by purchase, gift, devise, or condemnation any real or leasehold property needed for any public purpose * * *.' *It could scarcely be reasonably contended that the acquisition of property for public use is a legislative function,* and the appellant does not so contend. * * *.

"So far as the execution of the lease is concerned the County Executive is specifically granted that power by Article IV, § 12 of the Charter, previously referred to. The appellant argues, and we agree, that this is purely a ministerial function and that this section alone does not authorize the County Executive to negotiate and legally bind the County to the terms of the lease. But, in addition, § 2-1 of the Baltimore County Code authorizes the County to acquire real or leasehold property for any public purpose, *so that we hold that this gives the County Executive the power to negotiate leases and to bind the County thereto without the necessity of any previous authorization or approval by the Council because the acquisition of office space by means of a lease is an executive and not a legislative function. We further hold that the decision as to whether property is needed for a public purpose is one to be made by the Executive and that this also is an executive rather than a legislative function.*

"Examination of the Charter and Public Local Laws discloses nothing to suggest that the Council is required to authorize or approve leases of the type here in question, or any other contract into which the County may enter.

"The leading authority, 2 McQuillin, *Municipal Corporations* (3d ed.), § 10.06, gives a simple, comprehensive test for determining whether a particular matter is a legislative or executive function:

"\* \* \* If it can be shown that the particular act could not be done without a law or ordinance, such act is considered as legislative. The crucial test for determining what is legislative and what is administrative has been said to be whether the ordinance is one making a new law or one executing a law in existence.'

"Applying this test and the provisions of the Charter and Public Local Laws, we conclude that the County Executive in negotiating, executing, and binding the County to this lease, *was executing authority granted by laws already in existence, so that his action was of an executive rather than a legislative character." Id.* at 376-78. (Emphasis added.)

In a sense it is true, as the Bowens argue, that the power of eminent domain has been granted to the County but it is also true that the County can exercise the power only through the duly authorized personnel of its executive branch. The legislative branch, the Council, by the enactment of Sec. 1-317, *supra,* has clothed the County Executive with the authority and the duty of exercising the power whenever its exercise is required in order to complete the execution of any project for which the Council has budgeted and appropriated the necessary funds. It seems absurd to suggest that the same power granted to the County by the Legislature has been *delegated* to the County Executive. *See Master Royalties Corp. v. Baltimore City,* 235 Md. 74, 83 (1964) and *Pressman v. D'Alesandro,* 193 Md. 672 (1949).

Having held, in *Hormes,* that the County Executive was simply "executing authority granted by laws already in existence" when he negotiated and executed a ten-year lease of a floor of an office building, we have no difficulty extending that holding to include, in the circumstances here present, the condemnation of the Bowens' property. *City of Bowie v. County Comm'rs of Prince George's County,* 258 Md. 454 (1970). While we think the allega-

tions of the condemnation petition, as we have discussed them, are sufficient to survive the demurrer perhaps it would have been better practice to allege with greater particularity the details of the appropriation ordinance or, better yet, to attach, as an exhibit, a certified copy of it. Of course, at trial, the County will have the burden of proving its allegations.

The record suggests that the executive branch of the County has been unsure of itself in respect of the necessity of obtaining Council approval of condemnation proceedings. Early on we referred to the filing, as an exhibit, of a resolution of the Council approving other cases. To correct this apparent inadvertence the Council, on 2 February 1970, passed a resolution specifically approving the case against the Bowens. A certified copy, we were told, was presented to the trial judge at the hearing on the demurrer. He declined to consider it because the demurrer had been filed earlier. Since we think it was unnecessary we shall treat it also as surplusage.

On 28 January 1970, the Council repealed and reenacted with amendments Sec. 1-317, *supra,* to take effect 14 March 1970. Essentially the section remains unchanged except for the following provisions:

> "[P]rovided, however, if the County Executive is unable to acquire such property by agreement, the County shall not acquire the same by condemnation unless (1) the ordinance appropriating funds therefor has designated the public purpose for which the property is to be acquired and has described with reasonable accuracy the particular property to be acquired, or (2) unless prior to the acquisition by condemnation the County Council by resolution so describes such property and *determines and declares its acquisition to be necessary* for the public purpose designated in the appropriation ordinance." (Emphasis added.)

While the amended Sec. 1-317 has no effect on the de-

cision here announced we doubt that it will accomplish much in the way of improvement in the County's condemnation procedures. To write into the appropriation ordinance an accurate description of the "particular property to be acquired" may turn out to be both cumbersome and time consuming. The alternative requirement may amount, in light of the language of the charter, to an impermissible invasion of the province of the County Executive. *Hormes, supra.*

> *Judgment reversed.*
> *Case remanded for further proceedings.*
> *Appellees to pay the costs.*